USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/3/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                                  :
TIMOTHY SIMON SPICER, JEFFREY PAUL                                :
ARNOLD DAY, AND MARK ANDREW                                       :
BULLOUGH,                                                         :
                                                                  :
                                            Plaintiffs,           :          1:20-cv-3784-GHW
                                                                  :
                    -against-                                     :      MEMORANDUM OPINION &
                                                                  :             ORDER
NATIONAL UNION FIRE INSURANCE                                     :
COMPANY OF PITTSBURGH, P.A.,                                      :
                                                                  :
                                            Defendant.            :
                                                                  :
-------------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

        Defendant National Union Fire Insurance Company of Pittsburgh, P.A. ("National Union")

provided directors and officers liability insurance for the benefit of the executives of Aegis Defense

Services, LLC ("Aegis U.S."). The coverage did not extend to Aegis U.S.'s parent company, Hestia,

B.V. ("Hestia"). The plaintiffs were executives of Aegis U.S.; they were also shareholders of Hestia.

        The plaintiffs were involved in the sale of Hestia to GardaWorld Consulting (UK) Limited

("GardaWorld"). When GardaWorld sued the plaintiffs for alleged misrepresentations made in

connection with the sale, the plaintiffs demanded that National Union fund their defense costs, as

required by their directors and officers insurance policy. National Union refused, arguing that the

plaintiffs had acted in their capacity as shareholders of Hestia in their negotiations to sell that

company, rather than as executives of Aegis, so their conduct was not covered by the policy.

National Union also argued that, at the very least, the plaintiffs acted in a dual capacity, triggering a

provision that excluded coverage under the policy for losses arising from acts taken by them in any

role other than as executives of Aegis U.S.

The plaintiffs brought this action against National Union, seeking a declaratory judgment that National Union must advance their defense costs. Because the Court cannot conclude with certainty that the conduct asserted in the litigation against the plaintiffs falls outside of the scope of National Union's policy, National Union has a duty to defend the plaintiffs.

## I.     BACKGROUND

### A.     Facts

#### 1.     The Insurance Policy

National Union is a member company of American International Group, Inc. Policy, Dkt. No. 1-1 at 7.[1] National Union issued an insurance policy (the "Policy") to Aegis Defense Services, LLC ("Aegis U.S."), which was designated as the "Named Entity" under the Policy. *Id.* at 82. The Policy was effective on June 1, 2015. *Id.* at 11, 85.

The Policy covers, among other things, certain liabilities incurred by directors and officers ("D&O Coverage"). *See generally id.* at 33–45. As relevant here, the Policy provides coverage for "Individual Insureds." *Id.* at 33. Directors and officers of the "Company"—defined to include Aegis U.S. and its subsidiaries, *id.* at 18—qualify for coverage under the Policy. Significantly for this case, the Policy does not provide coverage for any parent company of Aegis U.S. or shareholder thereof. The parties do not dispute that all of the plaintiffs in this case qualify as "Individual Insureds" under the Policy.

The Policy requires National Union to "pay the **Loss** of the **Company** arising from a . . . **Claim** made against an **Individual Insured**, for any **Wrongful Act** . . . ." *Id.* at 33.[2] A "**Claim**" is defined broadly under the Policy to include a civil proceeding for monetary relief. *Id.* at 34. A "**Wrongful Act**" is defined in pertinent part as follows:

---

[1] Citations to the Policy refer to the page numbers automatically generated by the Court's ECF system.
[2] Coverage for an "Individual Insured" is only provided to the extent that he is indemnified by the Company. Policy at 33.

with respect to any **Executive** or **Employee** of a **Company**, [a **Wrongful Act** is] any breach of duty, neglect, error, misstatement, misleading statement, omission or act by such **Executive** or **Employee** in their respective capacities as such, or any matter claimed against such **Executive** or **Employee** of a **Company** solely by reason of his or her status as an **Executive** or **Employee** of a **Company** . . . .

*Id.* at 37.

The Policy contains a number of express exclusions from coverage. The carveout provided in Item 4(g) of the D&O Coverage section of the Policy is particularly significant here. That exclusion provides the following:

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured**: . . . (g) alleging, arising out of, based upon or attributable to any actual or alleged act or omission of an **Individual Insured** serving in any capacity, other than as an **Executive** or **Employee** of a **Company** . . . .

*Id.* at 38.

The Policy covers defense costs associated with covered claims. *Id.* at 33 ("The **Insurer** shall, in accordance with and subject to Clause 7 of this **D&O Coverage Section**, advance **Defense Costs** of such **Claim** prior to its final disposition."). "**Loss**" covered under the Policy is defined to include "**Defense Costs**" as well as other categories of damages. *Id.* at 36. "**Defense Costs**," in turn, are defined as "the reasonable and necessary fees, costs and expenses consented to by the **Insurer** . . . , resulting solely from the investigation, adjustment, defense and appeal of a **Claim** against an **Insured** . . . ." *Id.* at 35. The relevant paragraph of Clause 7 of the D&O Coverage Section of the Contract provides the following:

When the **Insurer** has not assumed the defense of a **Claim** pursuant to this Clause 7, the **Insurer** nevertheless shall advance, at the written request of the **Insured**, **Defense Costs** prior to the final disposition of a **Claim**. Such advanced payments by the **Insurer** shall be repaid to the **Insurer** by each and every **Insured** or the **Company**, severally according to their respective interests, in the event and to the extent that any such **Insured** or the **Company** shall not be entitled under the terms and conditions of this **D&O Coverage Section** to payment of such **Loss**.

*Id.* at 42.

## 2. The Parent Company of Aegis U.S. is Sold

The plaintiffs in this case were executives of Aegis U.S.  Complaint, Dkt. No. 1, ¶¶ 2, 25. They were also all shareholders of Hestia B.V. ("Hestia"), which was Aegis U.S.'s ultimate parent company.  *Id.*[3]

In July 2015 GardaWorld Consulting (UK) Limited ("GardaWorld") acquired all of the outstanding shares of Hestia.  *Id.* ¶ 3.  The acquisition was implemented pursuant to a Purchase and Sale Agreement, which governed GardaWorld's acquisition of Hestia and, through it, its subsidiary, Aegis U.S.  *Id.* ¶ 27.  Pursuant to the terms of the Purchase and Sale Agreement, GardaWorld paid the shareholders of Hestia approximately $130 million in cash at the closing of the deal on September 17, 2015.  Compl. Ex. B, Answer and Counterclaims, Dkt. No. 1-2 (the "Counterclaims"), ¶ 2.  In addition, the Purchase and Sale Agreement provided for earnout payments in later years "if the acquired Aegis businesses satisfied certain profit hurdles specified in the PSA."  *Id.*

## 3. Hestia's Shareholders Sue and GardaWorld Counterclaims Against Plaintiffs

In August 2017, Hestia's former shareholders, including the plaintiffs, sued GardaWorld in New York state court (the "Spicer Action").  Compl. ¶ 4.  They claimed that GardaWorld had failed to properly interpret and apply the terms of an earnout provision in the Purchase and Sale Agreement.  *Id.*

When it answered the state-court complaint on October 13, 2017, GardaWorld asserted counterclaims against the three plaintiffs in this case.  *Id.*  In doing so, GardaWorld chose to bring counterclaims only against those shareholders of Hestia who were also executives of Aegis U.S.  The

---

[3] The complaint does not provide additional detail regarding the corporate structure of Hestia and its subsidiaries—particularly, whether Hestia had significant subsidiaries other than Aegis U.S.

Counterclaims describe Messrs. Spicer, Day, and Bullough as "founders of a private security services company previously owned by Hestia, and are the former controlling shareholders of Hestia who, along with the other Sellers, sold their Shares to GardaWorld in 2015 pursuant to the PSA." Counterclaims ¶ 7.[4]

The Counterclaims assert that the plaintiffs engaged in fraud and aided and abetted fraud related to GardaWorld's acquisition of Hestia. While the Counterclaims involve the sale of the shares of Hestia, the facts pleaded in the Counterclaims focus on the acquisition of the business operated by Aegis U.S. and representations made by the plaintiffs regarding the financial condition of that company. The first paragraph of the Counterclaims states that

> GardaWorld asserts these counterclaims to recover the substantial damages it has suffered as a result of counterclaim defendants' fraudulent misrepresentations and omissions, which induced GardaWorld to acquire the *Aegis security services business* owned and operated by Hestia B.V. . . . through several subsidiaries. GardaWorld acquired the business ("Aegis") by purchasing from counterclaim defendants and Hestia's other former shareholders (collectively, the "Sellers") all of the outstanding ordinary shares of Hestia (the "Shares") at a materially inflated purchase price well above the true value of the Shares.

*Id.* ¶ 1 (emphasis added). Thus, from the outset, the Counterclaims reveal a focus on the acquisition of the business operated by Aegis U.S. by means of a purchase of Hestia's shares. And the Counterclaims distinguish between the group of "Sellers" under the Purchase and Sale Agreement— comprising all of the shareholders of Hestia—and the named counterclaim defendants (our plaintiffs), who were both shareholders and officers of Aegis U.S.

The Counterclaims describe misrepresentations by the plaintiffs regarding the financial condition of both Hestia in general and Aegis U.S. in particular. "In their contract negotiations with GardaWorld, counterclaim defendants materially misrepresented the financial condition of Hestia and one of its subsidiaries, [Aegis U.S.]." *Id.* ¶ 3. Those asserted misrepresentations included

---

[4] It is unclear whether this reference to the private security services company refers to Aegis U.S. or one of its subsidiaries.

financial statements provided by the plaintiffs which "fraudulently overstated Hestia's gross profit margins by falsifying its revenue, accounts receivable, and liabilities for the years 2012, 2013 and 2014." *Id.* The misrepresentations allegedly resulted in a material inflation in the value of the shares of Hestia purchased by GardaWorld. *Id.* ¶¶ 4, 5.

While the introductory paragraphs of the Counterclaims describe allegedly fraudulent financial statements of Hestia, the detailed factual allegations in the Counterclaims highlight misrepresentations regarding the financial condition of Aegis U.S., as revealed in that company's financial disclosures. *Id.* at 6 ("Counterclaim Defendants Materially Inflate EBITDA By Misrepresenting the Liabilities and Revenue of Aegis U.S."). The Counterclaims focus on a contract between Aegis U.S. or one of its subsidiaries and the U.S. State Department to provide security services to the U.S. embassy in Kabul. *Id.* ¶ 11. While much of the Counterclaims is redacted, they appear to claim that information about that contract was misreported by Aegis U.S. *Id.* ¶ 14. The Counterclaims specifically allege that "the Aegis U.S. financial statements provided by counterclaim defendants to GardaWorld masked the existence of [a] liability on its balance sheet by recording it as a credit to unbilled receivables and overstating its revenues . . . ." *Id.*

The Counterclaims allege that "the outside auditor for Aegis U.S. . . . confirmed to Day and Bullough" certain relevant information regarding the financial condition of Aegis U.S. *Id.* ¶ 16. And, the Counterclaims allege, the day before the closing of the transaction with GardaWorld, "Day reviewed and edited an internal Aegis U.S. memorandum" confirming that information. *Id.* ¶ 17. Among other things, that internal Aegis U.S memorandum confirmed that Aegis U.S. had "inflat[ed] the Aegis U.S. revenue that counterclaim defendants had falsely disclosed to GardaWorld." *Id.* The memorandum also acknowledged "that the liability had been 'masked' in the Aegis U.S. financial statements shown to GardaWorld . . . ." *Id.* ¶ 18.

The Counterclaims also allege that the financial statements provided to GardaWorld hid a material liability of Aegis U.S. *Id.* ¶ 20. As a result of certain underpayments, "Aegis U.S. had amassed a . . . liability . . . which *it* had omitted from the financial statements disclosed to GardaWorld before the parties signed the PSA." *Id.* ¶ 22 (emphasis added). Note that here, as above with respect to the other allegations in the Counterclaims regarding the Aegis U.S. financial statements, the Counterclaims specifically center on financial disclosures created by Aegis U.S., and assert that the results of Aegis U.S.'s labor were then turned over to GardaWorld.

The Counterclaims assert that the counterclaim defendants were aware of the specific misrepresentations in the Aegis financial statements because of their roles as executives of Aegis U.S. The Counterclaims allege that certain of the relevant, and undisclosed, liabilities "were reflected in 'Weekly SITREPs'—situation reports—prepared by Aegis U.S.'s Afghan affiliate that identified the amount of underpayments . . . ." *Id.* ¶ 23. The Counterclaims further allege that Spicer and Bullough each reviewed some of those revealing SITREPs. *Id.* Although not specifically stated in the Counterclaims, in this context, it is a fair inference that the SITREPs from Aegis U.S.'s affiliate were provided to the plaintiffs in their roles as executives of Aegis U.S.

The Counterclaims assert two separate causes of action against the plaintiffs. The first counterclaim asserts that the plaintiffs committed common law fraud. It alleges that the counterclaim defendants "made the material misrepresentations alleged above to GardaWorld regarding the financial condition of Hestia and Aegis U.S." *Id.* ¶ 25. Both counterclaims allege that the information provided by the counterclaim defendants "to GardaWorld regarding the financial condition of Hestia and Aegis U.S. falsely and materially overstated the revenue and EBITDA, and understated the liabilities . . . ." *Id.* ¶ 26. They did this, the Counterclaims allege "with the intent to defraud GardaWorld and induce GardaWorld to purchase the Shares under the terms of the PSA." *Id.* ¶ 27.

The second counterclaim against the plaintiffs asserts that they aided and abetted Hestia's fraud in their role as shareholders of Hestia. Unlike the first counterclaim, the second counterclaim specifically identifies the capacity in which the plaintiffs acted when making their misrepresentations to GardaWorld:

> When they entered into the PSA, Spicer, Day and Bullough were the controlling shareholders of Hestia who owned over 85 percent of Hestia's outstanding Shares. They also acted as Hestia's representatives and agents in connection with negotiating the PSA with GardaWorld. In that capacity, they made the fraudulent misrepresentations alleged above on behalf of Hestia, with knowledge that those representations were materially false and misleading.

*Id.* ¶ 31. By acting in that role, the Counterclaims assert, the plaintiffs "aided and abetted Hestia's fraud . . . ." *Id.* ¶ 32.

### 4. National Union Disclaims Coverage

The plaintiffs provided timely notice to National Union of the Counterclaims filed against them. Compl. ¶ 33. National Union acknowledged notice of the action in November 2017. *Id.* By letter dated January 17, 2018, National Union denied coverage for the Counterclaims. *Id.* ¶ 34. The insurer

> asserted that the Counterclaims were brought against the Insureds in their capacity as Employees or Executives of Hestia, not of Aegis. Therefore, [National Union] asserted that the Counterclaims did not constitute a Wrongful Act, which requires that the alleged conduct be taken by an Aegis Executive or Employee "in their respective capacities as such" or involve "claims against such Executive or Employee of a Company solely by reason of his or her status as an Executive or Employee of a Company."

*Id.* In its letter denying coverage, National Union also asserted that the exclusion contained in Item 4(g) of the Policy was implicated because the Counterclaims asserted that the plaintiffs had acted as representatives of Hestia in their discussions with GardaWorld. *Id.* ¶ 35.

The plaintiffs responded to the denial by letter. In it, they raised many of the arguments that are at the core of the dispute in this action. As a result, they merit quotation at length:

The Insureds explained that the Counterclaims explicitly target the Insureds in their capacities as Executives or Employees of Aegis. Specifically, the Insureds noted that "the facts in the Counterclaims that serve as the basis for GardaWorld's fraud claim pertain to the Insureds' alleged misrepresentations of *Aegis's* financial condition by their masking of *Aegis's* liabilities," and that this had the effect of allegedly inflating the value of Hestia's shares. The Insureds further noted that they had no ability to influence the presentation of Aegis's financial statements as shareholders or executives of Hestia. Rather, Aegis was constrained in its operations and in its communications with its shareholders by a specific Special Security Agreement (SSA) with the Department of Defense pertaining to Foreign Ownership Control and Influence (FOCI) regulations, which strictly limited the Insureds' access to Aegis to their role as directors and officers. Therefore, the Insureds could only have engaged in the conduct alleged in the Counterclaims (which allegations are in any event denied) as directors and officers of Aegis. This explains why the only shareholders of Hestia that were sued in the Counterclaims were the Insureds who were also directors and officers of Aegis.

*Id.* ¶ 36. The plaintiffs also argued that the 4(g) exclusion did not apply because the Counterclaims targeted Aegis-related conduct, and because the exclusion did not permit an insurer to disclaim all coverage merely because one allegation in the suit involved conduct undertaken in a non-insured capacity. *Id.* ¶ 37.

National Union was not persuaded by the plaintiffs' arguments. On May 29, 2019, it reiterated its denial of coverage. *Id.* ¶ 38. The parties engaged in a mediation process, which also failed to resolve the dispute. *Id.* ¶ 39. Meanwhile, the plaintiffs were able to obtain a commitment from Hestia's insurer, CHUBB, to pay a significant portion of their defense costs associated with their litigation of the Counterclaims. *Id.* ¶ 40. The CHUBB policy provided directors and officers liability coverage for Hestia and its subsidiaries. *Id.* CHUBB initially also disclaimed coverage on the basis that the plaintiffs had acted in their capacity as shareholders of Hestia, rather than as the officers or directors of Hestia or its subsidiaries, but CHUBB was later persuaded that it was appropriate to cover a portion of the plaintiffs' defense costs. *Id.*

In September 2018, the court in the Spicer Action granted summary judgment to the plaintiffs with respect to their claims regarding the earnout provision. *Id.* ¶ 5. That decision was

later affirmed by the New York State Appellate Division, First Department. *Id.* As a result, the only claims remaining to be litigated in the Spicer Action in New York State court are the Counterclaims.

**B.    Procedural History**

The plaintiffs initiated this action on May 15, 2020.  Compl.  The plaintiffs assert two claims for relief.  First, they seek a declaration that National Union "is obligated to pay the Insureds' Defense Costs incurred in relation to the Counterclaims that are not already being paid by CHUBB." *Id.* ¶ 53.  The plaintiffs also claim that by failing to pay their defense costs in accordance with the terms of the Policy, National Union has breached its contract. *Id.* ¶ 62.

On October 8, 2020, the parties filed dueling motions.  The plaintiffs filed a motion for judgment on the pleadings.  Dkt. No. 40.  In their motion, the plaintiffs seek a declaration that National Union is obligated to pay defense costs with respect to the Counterclaims.  On the same date, National Union filed a motion to dismiss.  Dkt. No. 42.  The arguments presented in the motions parallel those asserted in the parties' initial exchange of letters regarding National Union's declination of coverage:  National Union argues that the plaintiffs were acting as shareholders or executives of Hestia in connection with the representations to GardaWorld, and that, therefore, they are not covered by the Policy.  The plaintiffs argue that the Counterclaims focus on information provided by and regarding Aegis U.S., and that, therefore, the Court cannot determine as a matter of law that the Counterclaims are not covered under the Policy.  For the reasons that follow, the Court agrees with the plaintiffs.

## II.    LEGAL STANDARD

**A.    Rule 12(b)(6)**

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  However, a defendant may move to dismiss a plaintiff's claim for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In

deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true all well-pleaded factual allegations and draws all inferences in the plaintiff's favor. *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 809-10 (2d Cir. 2019) (quoting *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017)); *Chase Grp. All. LLC v. City of New York Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Courts "do not look beyond 'facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (ellipses and citation omitted). In addition to the well-pleaded facts in the complaint, the Court has also considered the Policy, Dkt. No. 1-1, the Answer and Counterclaims, Dkt. No. 1-2, and each of the other documents appended to the complaint, Dkt. Nos. 1-3 to 1-5.

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

"To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). Although Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation

of the elements of a cause of action will not do.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the

reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  A motion for

judgment on the pleadings pursuant to Rule 12(c) is subject to that same standard as a motion to

dismiss.  *See L-7 Designs, Inc. v. Old Navy*, LLC, 647 F.3d 419, 429 (2d Cir. 2011).

     **B.**       **The Declaratory Judgment Act**

     The Declaratory Judgment Act is used frequently to resolve insurance-coverage disputes.

*See, e.g., U.S. Specialty Ins. Co. v. Nationwide Mut. Ins. Co.*, No. 19-CV-7884 (MKV), 2020 WL 2489078,

at *2 (S.D.N.Y. May 14, 2020) (citing *Assoc. Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 35 (2d

Cir. 1992)).  The Declaratory Judgment Act provides in pertinent part the following:  "In a case of

actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an

appropriate pleading, may declare the rights and other legal relations of any interested party seeking

such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  A federal

court may exercise jurisdiction over an action for declaratory judgment only if there "exists . . . an

'actual controversy.'"  *E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 177 (2d Cir. 2001)

(quoting 28 U.S.C. § 2201(a)).  A justiciable declaratory judgment claim must be must be "'definite

and concrete, touching the legal relations of parties having adverse legal interests,'" as well as "'real

and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as

distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'"

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007) (quoting

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 81 L.Ed. 617 (1937)).

     "The Declaratory Judgment Act by its express terms vests a district court with discretion to

determine whether it will exert jurisdiction over a proposed declaratory action or not."  *Dow Jones &*

*Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003).

[T]o guide the exercise of discretion in Declaratory Judgment Act cases . . . [the Second Circuit has] articulated a simple test that asks (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty. *See Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1969). Other circuits have built upon this test, to ask also: ([3]) whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata'; ([4]) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and ([5]) whether there is a better or more effective remedy.

*Dow Jones*, 346 F.3d at 359–360 (citations omitted).

Here, there is no dispute regarding the justiciability of this dispute under the Declaratory Judgment Act. The plaintiffs are incurring defense costs as a result of National Union's decision to decline coverage. And there is no question that judgment by the Court regarding the scope of National Union's obligations under the Policy will "serve a useful purpose" and provide "relief from uncertainty." *Id.*

### C.      Interpretation of Insurance Contracts Under New York Law

"Under New York law, insurance policies are interpreted according to general rules of contract interpretation." *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 98 (2d Cir. 2012). Accordingly, "an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract." *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006). The "words and phrases [in a contract] should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (internal quotation marks and ellipsis omitted). "An ambiguity exists where the terms of an insurance contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d

Cir. 2000). However, "[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *Hunt, Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989).

"If a court concludes a provision in an insurance contract is ambiguous, it may consider extrinsic evidence to ascertain the parties' intent at the formation of the contract." *Olin*, 704 F.3d at 99 (citation omitted). "If the extrinsic evidence fails to establish the parties' intent, courts may apply other rules of contract interpretation, including New York's rule of *contra proferentem,* according to which ambiguity should be resolved in favor of the insured." *Id.* (citation omitted).[5]

### D.     The Duty to Defend

Insurance contracts often contain a "duty to defend." "The duty to defend is liberally construed and is broader than the duty to indemnify 'in order to ensure [an] adequate . . . defense of [the] insured,' without regard to the insured's ultimate likelihood of prevailing on the merits of a claim." *Fieldston Prop. Owners Ass'n, Inc. v. Hermitage Ins. Co.*, 16 N.Y.3d 257, 264 (2011) (quoting *Gen. Motors Acceptance Corp. v. Nationwide Ins. Co.,* 4 N.Y.3d 451, 456 (2005)).

> In New York, an insurer's duty to defend is "exceedingly broad" and distinct from the duty to indemnify. *Auto. Ins. Co. of Hartford v. Cook*, 7 N.Y.3d 131, 137 (2006). "The duty to defend is measured against the allegations of pleadings but the duty to pay is determined by the actual basis for the insured's liability to a third person.*" Servidone Constr. Corp. v. Sec. Ins. Co. of Hartford*, 64 N.Y.2d 419 (1985). "The duty [to defend] remains 'even though facts outside the four corners of [the] pleadings indicate that the claim may be meritless or not covered.'" *Auto. Ins. Co. of Hartford*, 7 N.Y.3d at 137 (second alteration in original). "Thus, an insurer may be required to defend under the contract even though it may not be required to pay once the litigation has run its course." *Id.*

*Euchner-USA, Inc. v. Hartford Cas. Ins. Co.*, 754 F.3d 136, 140 (2d Cir. 2014). "Indeed, the New York

---

[5] In its briefing, the defendant cites to cases describing New York's burden-shifting rule regarding proof of insurance coverage. *See, e.g.,* Dkt. No. 47 at 8 ("Plaintiffs fail to satisfy their burden to establish that the Counterclaims fall within the Insuring Agreement. 'Generally, it is for the insured to establish coverage . . . .'" (quoting *Consolidated Edison Co. of N.Y. v. Allstate Ins. Co.*, 98 N.Y. 2d 208, 218 (2002))). This is, of course, a correct statement of the burden of proof with respect to evidentiary issues. It is not, however, an apt statement of the relevant principles of contract interpretation and the duty to defend at issue here.

cases establish that '[s]o long as the claims [asserted against the insured] may rationally be said to fall within policy coverage, whatever may later prove to be the limits of the insurer's responsibility to pay, there is no doubt that it is obligated to defend.' In other words, a separate, contractual duty to defend exists, and perdures until it is determined with certainty that the policy does not provide coverage." *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 620 (2d Cir. 2001) (internal citations omitted).

"[A]n insurer will be called upon to provide a defense whenever the allegations of the complaint 'suggest . . . a reasonable possibility of coverage.'" *Euchner-USA*, 754 F.3d at 141 (quoting *Auto. Ins. Co. of Hartford*, 7 N.Y.3d at 137). "If, liberally construed, the claim is within the embrace of the policy, the insurer must come forward to defend its insured no matter how groundless, false or baseless the suit may be." *Id.* (internal quotation marks omitted). "Any doubt as to whether the allegations state a claim within the coverage of the policy must be resolved in favor of the insured and against the carrier." *Id.* (internal quotation marks omitted).

The duty to defend is a lasting obligation that continues "until it is determined *with certainty* that the policy does not provide coverage." *Hugo Boss Fashions*, 252 F.3d at 620.

> There are at least three kinds of uncertainty that can give rise to such a duty to defend. The first is factual: did the injury occur in a time, place, or way that is covered by the policy? The second is legal: will the cases governing the insurance policy be read to impose coverage in a given situation? The third arises from the existence of *contra proferentem*: will the terms of the contract of insurance be deemed to give rise to an ambiguity that must be read against the insurer or will they be held to be clear enough to avoid the presumption? Each of these uncertainties will ultimately be resolved by courts or juries—and often in favor of the insurer, thereby precluding coverage and the duty to indemnify. But until they are, the insurer cannot avoid its duty to defend.

*Id.* "Under some circumstances, the allegations contained in the complaint against the insured will by themselves eliminate all potential doubt and relieve the insurer of any duty to defend." *Id.* at 621 (citing *George Muhlstock & Co. v. Am. Home Assurance Co.*, 502 N.Y.S.2d 174, 179 (1st Dep't 1986)

("[W]here the facts alleged plainly do not bring the case within the coverage of the policy, there is no obligation to defend.")).

## III.    DISCUSSION

### A.    The Counterclaims Can Be Read to Charge the Plaintiffs with a "Wrongful Act" Covered Under the Policy

The Counterclaims can be read to allege that the plaintiffs committed a "Wrongful Act" under the Policy, triggering coverage.  The definition of the term "Wrongful Act" in Item 2(cc)(i) contains two clauses, separated by the disjunctive conjunction "or."  Policy at 37.  The defendant focuses its arguments on the second clause, which defines a "Wrongful Act" as "any matter claimed against such **Executive** or **Employee** of a **Company** *solely* by reason of his or her status as an **Executive** or **Employee** of a **Company** . . . ."  *Id.* (emphasis added).  The defendant argues that the Counterclaims were not brought against the plaintiffs "solely" because of their roles as executives of Aegis U.S.  Instead, the defendant argues, the claims were made against them at least in a dual (or treble) capacity, as shareholders, directors, and officers of Hestia, in addition to their roles at Aegis U.S.

The defendant's arguments regarding the second clause of the definition of "Wrongful Act" are a red herring.  That clause is unambiguous, and it excludes coverage for matters claimed against an executive of the insured in a dual capacity, as here.  But the second clause does not dictate the result in this case; the first clause does.

There is a reasonable possibility that the conduct alleged in the Counterclaims constitutes a "Wrongful Act" as described in the first clause of the definition of the term.  There, a "Wrongful Act" is defined to include "any breach of duty, neglect, error, misstatement, misleading statement, omission or act by such **Executive** or **Employee** in their respective capacities as such . . . ."  *Id.*  As described above, the alleged misrepresentations made by the plaintiffs to GardaWorld related to the Aegis U.S. business.  The misrepresentations were included in the financial statements of Aegis U.S.,

16

and the Counterclaims specifically allege that the misrepresentations were made by Aegis U.S. *See, e.g.,* Counterclaims ¶ 22 ("Aegis U.S. had amassed a . . . liability . . . which *it* had omitted from the financial statements disclosed to GardaWorld before the parties signed the PSA.") (emphasis added). It may be reasonably be inferred that the plaintiffs acted in their roles as executives of Aegis U.S. in preparing the misleading financial statements of the company that were later provided to GardaWorld. The Counterclaims clearly point to misstatements in the Aegis U.S. financial statements, which may be attributed to the plaintiffs acting in their capacity as executives of the company.

The Counterclaims do not expressly limit the liability of the plaintiffs to conduct committed in their roles as executives or shareholders of Hestia. As the defendant correctly observes, the second counterclaim, for aiding and abetting Hestia's fraud, states that

> When they entered into the PSA, Spicer, Day and Bullough were the controlling shareholders of Hestia who owned over 85 percent of Hestia's outstanding Shares. They also acted as Hestia's representatives and agents in connection with negotiating the PSA with GardaWorld. In that capacity, they made the fraudulent misrepresentations alleged above on behalf of Hestia, with knowledge that those representations were materially false and misleading.

*Id.* ¶ 31. This allegation specifies the capacity in which the plaintiffs made the alleged representations. However, there is no similar limitation defining the capacity in which the plaintiffs allegedly acted when making the asserted misrepresentations that are the target of the first counterclaim. The Court cannot conclude from the face of the Counterclaims that the capacity constraint detailed in the second counterclaim applies to the first counterclaim. To the contrary, the presence of that limiting language in the second counterclaim suggests that no such constraint should be read into the first counterclaim.

The fact that the Counterclaims were interposed in response to a suit brought by shareholders of Hestia does not imply that the Counterclaims must be limited to claims against the plaintiffs in their capacity as shareholders of Hestia. The Counterclaims did not name all of the

shareholders of Hestia who brought suit against GardaWorld; they named only the shareholders who were also executives of Aegis U.S. As described above, the Counterclaims focus on misrepresentations about the financial condition of Aegis U.S. And the Counterclaims focus on briefings that the plaintiffs likely received as officers of Aegis U.S. to support the assertion that the plaintiffs had knowledge of the inaccuracy of their statements. *See, e.g.*, Counterclaims ¶ 23 (describing " 'Weekly SITREPs'—situation reports—prepared by Aegis U.S.'s Afghan affiliate that identified the amount of underpayments . . ." which were reviewed by two of the plaintiffs).

Because the Counterclaims describe misstatements made by the plaintiffs in their roles as executives of Aegis U.S., and the first counterclaim is not necessarily limited to misstatements made by the plaintiffs in their capacities as officers, directors, or shareholders of Hestia, the Court cannot conclude as a matter of law that the Counterclaims do not implicate "Wrongful Acts" for which the plaintiffs may seek indemnification under the Policy.

**B.     The Court Cannot Conclude as a Matter of Law that the Counterclaims Fall Within Exclusion 4(g)**

The Court cannot conclude as a matter of law that the Counterclaims fall within the scope of exclusion 4(g). There is a reasonable possibility that they do not. Issues of fact preclude a determination that defense costs are not available in this case.

At the outset, the language of the exclusion is unambiguous. *Accord Goggin v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. N17C-10-083 PRW CCLD, 2018 WL 6266195, at *1 (Del. Super. Ct. Nov. 30, 2018) (applying Delaware law); *Langdale Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 609 F. App'x 578, 591 (11th Cir. 2015) (applying Georgia law). Broadly speaking, it excludes payments for losses in connection with claims "alleging, arising out of, based upon or attributable to any actual or alleged act or omission of an **Individual Insured** serving in any capacity, other than as an **Executive** or **Employee** of a **Company** . . . ." Policy at 38. To the extent that the claimed losses arise from the

plaintiffs' conduct in their capacities as shareholders or officers of Hestia, they are excluded from coverage under the Policy.

The bar is not high for the defendant to prove that the alleged conduct arose from the plaintiffs' conduct in their capacities as shareholders or officers of Hestia, and, thus, to invoke the exclusion. "The New York Court of Appeals has held that the phrase 'arising out of' is 'ordinarily understood to mean originating from, incident to, or having connection with.' The phrase requires only that there be some causal relationship between the injury and the risk for which coverage is provided." *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 568 (2d Cir. 2011) (quoting *Maroney v. N.Y. Cent. Mut. Fire Ins. Co.*, 5 N.Y.3d 467, 472 (2005)) (internal citations and quotations omitted).

However, the Court cannot conclude from the facts pleaded in the Counterclaims that the exclusion must apply to those Counterclaims. As described above, the Counterclaims target alleged misrepresentations in the financial statements of Aegis U.S., which were later provided to GardaWorld. The conduct of the plaintiffs that is implicated by the Counterclaims may have been undertaken by the plaintiffs solely in their capacity as officers of Aegis U.S. For example, the misrepresentations in the Aegis U.S. financial statements may have been made prior to the sale to GardaWorld. It is also not inconceivable that the plaintiffs acted in their capacity as executives of Aegis U.S. when they provided information to GardaWorld: an officer of a subsidiary of a holding company could be expected to provide information regarding her subsidiary to a potential purchaser of the holding company in her capacity as an officer of that subsidiary. Doing so would reasonably fall within the scope of her work as an officer of that subsidiary. The Court cannot determine as a matter of law that the exclusion must apply to the facts asserted in the Counterclaims; there remain legitimate questions of fact regarding the capacity in which the plaintiffs acted when undertaking the conduct at issue in the Counterclaims. There is therefore a reasonable possibility that the exclusion does not apply.

This case is factually distinguishable from the cases upon which the defendant relies heavily in its briefing: *Goggin v. National Union Fire Insurance Co. of Pittsburgh*, 2018 WL 6266195 (Del. Super. Ct. Nov. 30, 2018) and *Langdale Co. v. National Union Fire Insurance Co. of Pittsburgh, Penn.*, 609 F. App'x 578 (11th Cir. 2015). The courts in both *Goggin* and *Langdale* examined nearly identical language to the exclusion at issue in this case. In both cases, the courts determined that the claims arose out of the insured's action in a capacity other than as an executive of the insured company, and that, therefore, the exclusion applied. However, the cases are factually distinguishable in several ways. The Court will highlight only two here.

First, as described above, the misrepresentations alleged in the Counterclaims were included in the insured company's financial statements prepared by the plaintiffs in their capacity as executives of the insured company. The court in *Langdale* confronted a different situation, and observed that the relevant "counterclaim did not allege that TLC's directors committed wrongful acts 'in ways unrelated' to Johnny and Harley Langdale's wrongdoing as trustees." *Langdale*, 609 F. App'x at 594. Here, the Counterclaims do allege wrongful acts 'in ways unrelated' to their acts as shareholders of Hestia—as executives of Aegis U.S., they are alleged to have manipulated the company's financial statements.

Second, both *Goggin* and *Langdale* involved a degree of self-dealing by the insureds—conduct inconsistent with their roles as executives of the insured companies. In *Goggin*, the insureds were sued for breach of their fiduciary duties to the insured company after the company went bankrupt. They were alleged to have engaged in transactions for the benefit of separate companies controlled by them at the expense of the insured company. In *Langdale*, the insureds were sued for, among other things, breach of their fiduciary duties to the minority shareholders of the insured company, as well as the beneficiaries of a trust that owned some of the company's stock. As trustees of the trust, the insureds made misrepresentations regarding the value of the trust's shares in order to persuade

the trust beneficiaries to sell the stock to the company at a substantial discount. On those facts, the court was able to conclude that the insureds' "wrongful acts as [insured company] directors arose out of their wrongful acts as trustees of the Trust." *Langdale*, 609 F. App'x at 594. Because the wrongful acts arose out of their conduct in a capacity other than as an executive of the insured company, the exclusion applied.

Simply put, it is easier to conclude with certainty that a person was not acting in their capacity as an executive of an insured company when it is alleged that she acted in a way that was inconsistent with her responsibilities as an executive—such as by breaching her fiduciary duties to the company, or otherwise engaging in self-dealing. Those features characterized the allegations in *Goggin* and *Langdale*. Here, by contrast, the Counterclaims do not assert that the plaintiffs breached their fiduciary duties to the insured company or to its shareholders. They are not accused of acting against the interest of the insured company. Instead, as described above, they are alleged to have acted in a way that is consistent with their roles as executives of the insured company. To be clear, the absence of such allegations of self-dealing is certainly not dispositive. The Court simply observes that the absence of such allegations makes it more difficult to conclude with certainty as a matter of law that the plaintiffs acted in a role other than as executives of the insured company.

### C. National Union Is Obligated to Cover Defense Costs In Accordance with the Policy

Because the Court cannot conclude with certainty that the policy does not provide coverage, National Union has a contractual duty to defend the plaintiffs against the Counterclaims. *See Hugo Boss*, 252 F.3d at 620. The holding of the Court in this matter is consistent with the recent decision of the First Department in *Westchester Fire Ins. Co. v. Schorsch*, 186 A.D.3d 132, 147, 129 N.Y.S.3d 67 (1st Dep't 2020). As there, disputes remain regarding the application of the Policy to the Counterclaims. Accordingly, the plaintiffs are entitled to judgment on the pleadings with respect to their application for declaratory judgment, and the defendant's motion to dismiss must be denied.

## IV.    CONCLUSION

The duty of an insurer to defend continues unless it can be determined with certainty that a claim is not encompassed within an insurance policy.  The Court cannot conclude with certainty that the Counterclaims fall outside of the scope of the coverage provided by the Policy.  Consequently, the plaintiff's motion for declaratory judgment is GRANTED, and the defendant's motion to dismiss is DENIED.

The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 40 and 42.

SO ORDERED.

Dated:  July 3, 2021
New York, New York

_____
GREGORY H. WOODS
United States District Judge